Case number 16-5552, Ronald Moore et al. v. City of Memphis et al. Arguments not to exceed 15 minutes per side. Mr. Rosenblum for the appellants and the time will be split by the defendants. Mr. Myers will argue for 8 minutes and Ms. McKinney will argue for 7 minutes. And Mr. Rosenblum, you may proceed. Thank you. Thank you, your honors. Jeff Rosenblum from Memphis. May it please the court, I'd like to reserve 5 minutes for my rebuttal. We're here on an excessive force case. As Judge Sutton said, this is a death case that we believe should have survived summary judgment. Ronald Moore was 67 years old, a veteran, had never been in trouble before, had never committed a crime. He had a lot of dogs, a lot of cats, a lot of birds, a lot of bunnies, a lot of weird animals and his neighbors complained. An animal control person came over and he was rude and offensive to her. He told her to get off his property. He had gestures that she interpreted to make it scary for her to come back. Supposedly he made comments to his neighbors that we believe were hearsay comments, but comments to the neighbors that if they came back, the animal control people came back, he'd shoot first and ask questions second or he'd hurt somebody if they came back because he loved his animals. I certainly wish Mr. Moore had complied with Ms. Lynch when she first knocked on the door. I certainly wish he had said, come in and check on my animals, I have nothing to hide. But he didn't and there was no search warrant and I'm not sure he... Before we kind of move on, I mean, he did more than be rude and uncooperative. Isn't it fair to say that he gave, I think, the neighbor and the officers, separately on those occasions, reason to believe he had a firearm? He was kind of acting like he was reaching for a firearm. That's a very important fact here. Absolutely, absolutely. I'm not going to gloss over that fact and that's why the Memphis Police Department got involved. He reached back in front of the animal control officer as if he had a gun. She assumed he had a gun. He may have been scratching his back, I don't know what he was doing. He didn't say he had a gun. He did not make a threat to her except get off my property. He supposedly made a threat to the neighbor. That's a real threat that should be considered. But it's like triple and quadruple hearsay, Judge, because the TAC unit officer who actually made the decision to go in and use the dynamic entry and flashbangs and everything they use every single time, he had no idea about that threat. He didn't know what the neighbor had said. And so, Your Honor, all of those things were pre-search warrant. And I think it's real important. Pre-search warrant, this guy refused to comply. Pre-search warrant, he was given ample opportunity to comply and he just flat out said no. And I'm not sure that is a violation of any law not to comply and not to voluntarily talk to officers. In fact, one of the officers testified, we can't make him talk to us. Nobody even talked to him after there was a valid search warrant. Is it your argument that it was Barry Hill that made the decision to use TAC to execute the warrant here, is that correct? Barry Hill was the one who had to approve it, yes, Your Honor. Well, okay. But the person who, somebody recommended that decision to him? Evidently someone recommended the decision to him. I believe it was a major, Morris, that made the recommendation to him. But he has to be the one to approve it. Okay. But Morris was aware of these incidents that we just talked about, correct? Morris was told by somebody who was told by somebody who was told, yes, Your Honor. But surely the law doesn't require the more senior officer back at headquarters who makes this decision to have been the one who went to the door that day. So the decision was made to use the ultimate force the police department has. This is over-militarization of our police force. This is like going to find some al-Qaeda leader. They come in all in black with helmets and plexiglass and bulletproof vests with M4 assault rifles at night. And a man who doesn't know they're coming, there is no knock and announce. They affirmatively said we chose not to. It was our intent not to give him an opportunity to comply. And Barry Hill, the very one. Animal control complaint. Over a misdemeanor, potential misdemeanor animal control, whether he was taking care of his animals. There was no allegation. I'm sorry, Your Honor. Poorly taking care of them apparently. And eventually they found that there were some animals that were not being taken care of. There were lots of animals. But there was no even indicia of a felony. Nobody was thinking this was felony. But the violation, whether it's misdemeanor or felony, they have reason to think that there's some violation happening in the house. They've tried to approach him and sort of make this a cooperative thing. And rather than get cooperation, they get an implied threat that he's got a weapon and he's ready to use it. And he's said the same thing to a neighbor. So how are they supposed to enter this house then? How should they go about that? And if we're writing an opinion, what should we say so that in maybe one or two cases out of ten, we don't have an officer who actually gets killed? Sure, sure. So, Your Honor, what I would suggest is exactly what the case law says, and that before a decision is made to use dynamic entry at night with flashbangs, whether it be a felony or misdemeanor, that a thorough risk assessment be done. I think it was the Ramage case that talked about this matrix that must be done. It's part of the investigation that it's a case-by-case analysis. What case was that again? Ramage v. City of Louisville and County of Jefferson, I believe. And it talks about analyzing these on a case-by-case basis. Your Honor, as the trial lawyer taking the deposition of Officer Penny, how delighted I was when he said we didn't do a case-by-case analysis. We serve it this way every single time. But setting that aside, in your view, how should they have executed the warrant? In this particular occasion, nobody sent a CIT officer to talk to him. They tried to. They tried to after the warrant. I want Your Honors to realize there is pre-warrant activity. So your point is someone should have come up there and just knocked and said let's talk about what's going on? Is that the idea? No officer that had a critical incident trained officer, a CIT officer, ever had a conversation face-to-face with him. There was a conversation before the warrant was issued. No one ever said to him, Mr. Moore, we have a valid lawfully obtained search warrant. We want to cooperate with you and want you to cooperate with us. Nobody ever said that to him. He was never notified that there was a search warrant. Before there was a search warrant, he was belligerent, he was obnoxious, he was cranky, get out of my property, leave me alone, making threats, before there was a search warrant. And then when there's a search warrant, Barry Hill says it himself. We should give him an opportunity, everyone an opportunity to comply. He was never given that opportunity after there was a search warrant issued. And if Barry Hill says if they didn't give him an opportunity to comply, it's unacceptable. And if Director Armstrong, the head of the police department, says it's unacceptable, Your Honor, I'm sorry. I believe that it was unfair for after the fact, Judge Anderson, our trial judge, to look at it and say, well, I think it was acceptable under these facts, knowing everything that I know that maybe they didn't know. So Mr. Moore was never given an opportunity to comply after. But they didn't know about the potential threat with a gun. The potential threat with a gun, and I don't want to gloss over it again, that's a huge issue. And that warrants the animal control officer going to law enforcement officers and saying this is over my head, I'm scared. She says I think he's crazy. The city identifies him as a mental consumer out of one side of its mouth, but then denies that he was a mental consumer out of the other side of its mouth. And there's a set protocol for how you deal with mental consumers that they completely went contrary to. But, I mean, one thing that they had heard was Mr. Moore said if the animal control officer, Lynch, came back, he would kill her. I mean, so we still have to write an opinion that said they had an obligation to send a different kind of officer again to talk to him? Your Honor, I think you don't send an animal control officer after that. I think that would be prudent for the city of Memphis to have. But isn't it fair for them to think, okay, he's threatened to kill an officer of some kind, and we're past the stage of officers kind of talking to him, and now we simply have to execute the warrant. And at that point, what is the safe manner to do that? So their choices are we can just give it to the TAC unit, knowing, they should know, I guess it's imputed to them, that every single time the TAC unit, irrespective of the case, irrespective of the circumstances, is going to break windows, throw hand grenades in there, which are essentially grenades, these flashbangs, throw four of them in there and go in to accomplish their mission without giving an opportunity to comply. You get full credit for that point. Okay. And at night they do that. And the case law says analyze the case. What should they have done? They should have. Let's say going out and having another conversation is not an option because he said he would kill the other officer. They're just not going to take that risk. How do they execute a warrant in a residence where the guy has made a threatening gesture about a firearm and threatened to kill a different kind of officer if she returns? I mean, what do you do there? There are lots of different options, and we went through the options that they had. They can get into a barricade situation. They can have force there with law enforcement officers, with Bullhorn saying, we have a search warrant. We want you to let us search your house. Give him an opportunity. No one ever did that. We can find out what the name of his son and daughter are and call them. We can have critically trained officers come and actually have a conversation after there is a search warrant. Is there a case, because this is qualified immunity, you know sort of the rules of the game. Is there a case that you would point to that clearly establishes that the officer had to use one of these, or the officers had to use one of these other approaches rather than the one they used? You know, a case that said let him barricade himself in or whatever. Your Honor, I think there are cases, and Bramage is one of them, Dawkins is one of them, that talk about having to do an independent case-by-case analysis. Well, set that aside. I'm talking about the actual method of executing the warrant. Is there a case? I am not aware except that that's how you determine the actual method is to do this case-by-case risk assessment. That was not done here. How about whether an assessment or not, a case that's not going to announce alleged violation and after they break in, the person in the house points a weapon at the officers. Is there a case where the court finds a not-going-to-announce violation because there weren't exigent circumstances, even though later on the person they were looking for points a weapon at the officers? I am not aware of that case, but I want to clarify. It seems really doubtful to me. Well, Your Honor, the very thing they were worried about happens. Well, we can break it down into segments, because I think one important segment, I'm saying it all happened within a minute or two. First of all, it's not a qualified immunity case. The court didn't address qualified immunity. The court said there wasn't a constitutional violation. So we're not here on qualified immunity. We're here on the constitutional violation. And clearly here, the pattern of conduct is established that I think the city, and one of the purposes, I think, of our civil rights law is to provide redress for past violations and protect us all for future. And the city has this unconstitutional practice of sending in the TAC unit and doing the no-knock and doing the flashbangs without doing a case-by-case analysis. And we've just glossed over that to say it's okay, even though we recognize it's probably unconstitutional, because here he pointed a gun at the end of it. That officer had an opportunity. And, Your Honor, I brought the tape, and I'm rebuttal. If Your Honors will let me play it, I'd like to play that last one and a half minutes or so of Mr. Moore's life, where he doesn't believe that they're officers. And they're outside, and Penny says it wasn't a last-second decision. It wasn't a split-second decision. I had plenty of time to make the decision. I could have stayed there in a barricade-type situation. He wasn't in the room. Mr. Moore didn't come out and point the gun at the officers. The officers chose to throw in another flashbang when the officer admitted that he knew, that Mr. Moore doubted, doubted that he was an officer. And really, to me, one of the more troubling aspects is Mr. Moore is on the phone with dispatch, and dispatch doesn't even know. The right hand doesn't know what the left hand is doing. If the officer on dispatch would have said, Mr. Moore, these are officers. They're serving a search warrant. Please come down and cooperate. I think the outcome would have been different. She says, I don't know who you're yelling at on this tape. I thought that was a 911 call. He calls 911, and he's talking to dispatch for the city of Memphis, and the dispatch officer has no idea that the TAC unit is there to serve a search warrant. And she doesn't tell him, calm down, they're there, because he's saying, people are shooting in my home. Penny said over and over, Don, we have a search warrant. We're here with a search warrant. That's why I think it's important for your honors to listen to the tape. It was part of the record, and it's very short. He is saying it, but it's about a second and a half after he throws another flashbang in that he shoots and kills him. And he recognizes, Penny's testimony is, I thought he didn't believe us. I questioned that he was doubtful that we were really officers. Again, there are no blue uniforms or no blue lights. There's no lieutenant there. They're all in these big black military TAC unit gear with M4s. I believe my time is up. Thank you. Thank you. May it please the Court, good morning, your honors. I'm Richard Myers. I represent the city of Memphis, the appellee in this matter. My colleague, Betsy McKinney, represents Officer Penny individually. We are going to split our time eight and seven. I am primarily here to answer any questions the court has about the record or the case law to the extent that I can answer it adequately, because I cannot improve on how the district court analyzed this case in granting summary judgment. Ms. McKinney might be able to answer questions more satisfactory to the court than I can. Is it a standard practice to execute search warrants regarding animal control complaints at night with a SWAT team? No, ma'am. As the district court recognized, TACT is used under very specific circumstances. And those circumstances were present here. Namely, you have a search warrant, you have a threat of violence against law enforcement or anyone coming onto the property. You have a reasonable belief that there's access to a gun. And, yes, they go in at night because the police officers deserve the tactical advantage regarding serving a search warrant, any search warrant, whether it's animal control. So does Memphis always execute search warrants at night? Under a circumstance where TACT executes it, which, again, is a circumstance of a high-risk threat of violence to the police officers, where we want to avoid as best as possible the death of our police officers. Really, I guess bottom line, one of the things that upsets me the most about this case is that apparently the city of Memphis is willing to put its officers at that kind of a risk over an animal control complaint. Your Honor, it wasn't that it was an animal control complaint. It was a circumstance where the subject of the service of the search warrant had on multiple occasions, not just one occasion and not just to a couple of different people, he had on multiple occasions threatened the use of violence. The circumstance on October 15, 2012, where Mr. Moore, the decedent, did this in response to being asked to show his hands, two police officers were there. They were there because Ms. Moore or Ms. Lynch, the animal rights, the animal control officer, had heard from a neighbor that this man is a risk, this man scares me, he has threatened me. She then was prompted to, in going back to do her very standard job of checking to see if animals are okay, wanted MPD to go with her. They did, and in the presence of MPD, asking this man to just come out and talk and have a conversation, let this officer do her job. He acted in such a way that indicated he had a firearm and he was noncompliant. Under a circumstance like that, that's a concern. Then January 8, going back with more MPD saying, would you come out and would you talk to us, one of which was a CIT officer, there primarily to determine whether or not there was any basis for thinking that this man had any sort of mental issue, which in this record, there is zero evidence that this man had any mental issues. Again, noncompliance. Again, you then heard from the next door neighbor saying that after you left, the decedent came out and once again said, if she comes back, I'm going to kill her. Then you had on January 11, Lieutenant Colonel Worthy sending out two more MPD officers to canvas the neighborhood, to prepare the area for going in there to deal with somebody who needed to be separated from his gun. Once again, you have a neighbor saying to these two MPD police officers, this man has threatened to kill anyone who comes back to the premises. Shoot first, ask questions later. Respectfully, Your Honor, that takes this out of just a simple, I'm not feeding my dog's case. It may be like a jaywalking, and it's one thing to cite someone for jaywalking, but if that someone says, if you cite me, I've got a gun and I'm going to shoot you, that's an entirely different circumstance, and that's our circumstance here. That's why MPD use TACT. This is the only circumstance really where MPD uses TACT, and when you use TACT, there are certain tactics that you use every single time. It's a tool that you use under very specific circumstances where there's an indication, a reasonable suspicion that exigent circumstances exist that constitute the threat to an officer's safety. Our officers are entitled to protect themselves in doing their daily duty to serve a search warrant. Why would they do this at night? It gives them a tactical advantage, and it's a tactic that they use. Okay. I mean, I'm not an expert, and I don't presume to tell them how to do their work, but, I mean, it's just going to greatly increase the apprehension of the resident that it's some kind of break-in or something. I believe the time was about 6 p.m. It was January, so it was dark, and I guess that's night, but, yeah, it's more a question of the benefit of the darkness. And, again, MPD had been out there on multiple occasions trying to get a hold of Mr. Moore. There was every indication he was not going to comply, and when you've got that kind of situation, I'm not here to judge their tactics. I'm just telling you what their tactics are, and their tactics are, and in their judgment, this is the best approach we have to making sure our people go home alive. They weren't out there breaking the law, and all Mr. Moore needed to do was comply. And what we have to be absolutely clear is the proximate cause of the use of deadly force against Mr. Moore, the decedent, was Mr. Moore's decision to point a weapon at Officer Penny. To answer your question, Judge Sutton, you asked for a couple of cases where we had the circumstances we have here. Asked for any case. Well, I've got two of them. One of them Judge Batchelder wrote. It's the Great House v. Couch case. That was the case where, and the district court here relied on it heavily, where you've got a circumstance where there may have been a knock-and-announce problem, but that's conceptually distinct, and there may have been a problem, but at the end of the day, you've got somebody going in, police going in, SWAT going in, they didn't knock-and-announce. And that may be a problem, we don't know. But at the end of the day, somebody walks out, fires a couple of rounds off at the police officers, and the court concluded that that was the proximate cause of the death. But you didn't have that here. The guy was in the middle of his own house with his bunnies and his chickens, which he was apparently not treating appropriately. He had told the neighbor, because apparently he was a fairly obnoxious guy, he told the neighbor to leave him alone or, you know, he's going to shoot her. He never displayed a weapon to the police. I'm not talking about when they shot him. I'm just talking about up until that point. Certainly prior to their obtaining the warrant, he'd never displayed a weapon to the police. And as far as we know on this record, he'd never displayed a weapon to anybody. He just scared his neighbor by telling her he could do that. He didn't come out and fire at the police. He was in his house, and they initiated all of this by throwing the flashbangs in there, charging in without knocking-and-announcing. He's been broken into. He's on the phone asking for help, and they come charging in with another flashbang. And the way I read this record, I'm a little concerned about whether there might be even an issue of fact as to whether he had a gun in his hand at that point. It seems a little odd. I mean, here he is on the phone calling 911, asking for help. Lots of times when you use a phone, you need two hands to do it, but not necessarily. But, I mean, it's just he didn't initiate what would cause them to shoot him in the way that the case that you're referring to, clearly there was some instigation on the part of the victim. Actually, Your Honor, in Gradov's v. Couch, the decedent in that case, neither did she initiate the circumstance. It's really, respectfully, it's almost the exact same. I thought the one you were reciting, the quote, victim shot first. That's correct. That's what you said. Well, that didn't happen here. The facts in that case were, the disputed facts in that case were that she fired two shots into the ground. And she was confused. That was the whole idea there as well. She was confused. She didn't know what was going on. The person charged in didn't have a uniform on. And in this circumstance, we had officers in uniform. Well, officers in SWAT team gear coming in in the night season. Yeah, this isn't the beat cop walking down the sidewalk in uniform. I mean, you talk about not complying. And sure, we see cases almost every week where somebody doesn't comply and they end up dead. And in many cases, those people do not recover because the officers had reasons for what they did. But, I mean, isn't it pretty darn hard to comply when you're sitting at home at night eating dinner or something, and the next thing you know, these guys smash in your front window and are, like, jumping in. You've got guys coming in the back window. And then these flashbangs start going off. I mean, it would seem that it is just such sensory overload and shock, you know, shock and awe, literally, that your brain cannot function enough, cannot understand enough about what's happening to comply. And so, I mean, isn't this a different case than ones where somebody is voluntarily not complying? No, Your Honor, it's not, and it's for this reason. The focus has to be on what was the risk, what was the threat that Officer Penny reasonably faced. And there have been multiple cases in the Sixth Circuit, I've got them all written down, if I wish I could remember them, Whitlow and so on and so forth, where the question is not trying to speculate about what was in the head of the decedent. But we can't fault him for not complying with this chaos that all of a sudden comes over him like a tidal wave. And he may have been stupid in not what is being characterized by you as complying, prior to the point at which he had any actual obligation to comply. I mean, when they show up with a search warrant and say we've got a search warrant, then, yeah, he doesn't have any options. But they never did that. All of his noncompliance, except for the very final moment there, all of his noncompliance had to do with leave me alone, get off my property. And that's correct, which is fine. Every citizen has the right to say it. But you didn't view that as fine. You viewed that as a reason to send in the SWAT team. Well, the basis for sending in the SWAT team was the threat of harm to law enforcement. But if the law enforcement hadn't broken in there, you didn't have any reason to expect a threat of harm. Suppose the law enforcement had been outside with bullhorns or something and saying, hey, you know, you're mistreating your rabbits, and we're going to come in there. We've got a search warrant. One way or another, we're coming in. And he had then said, you come in here and I'm going to shoot you. Okay, maybe a different issue. Maybe it's worth exposing law enforcement to that risk over the animal control problem. But that isn't what happened here. They never gave him that opportunity. Your Honor, I respectfully disagree. I think the record reflects that we did give Mr. Moore the deceit and every opportunity to comply with legal law enforcement process. And the issue really must be when there was a ‑‑ When? When Officer Lynch went out there and said, listen, I need to ‑‑ When, when he really had an ‑‑ prior to that warrant, what you're calling noncompliance, I would say was noncooperation. That's fine. But what was his obligation up until the point of the warrant to do what you asked him? His obligation to allow law enforcement into his house to do their job. Without a warrant. Absolutely. Without a warrant, there was no obligation. There was no obligation. So you didn't give him a chance. However, Your Honor, it's a question of when that search warrant was to be served. What were the circumstances of the service of that search warrant? And were there exigent circumstances facing those police officers based on a reasonable suspicion? Only if they went in there. It's not like he was going to be disposing of evidence, which is one usual exigency. It's not like he had a hostage in there, which is another. None of those things were present. The only way that the officers were going to be at risk is if they threw the flashbangs and barged into his home dressed as SWAT team. And that's ‑‑ it's troubling to see that going on and have the city saying, oh, this is fine. It's the same circumstance that was faced in Ramage. The same circumstance was faced in Whitlow where you've got the need to serve a warrant, either an arrest warrant or a search warrant, under a circumstance where there may have been a risk matrix, whatever. And there's a conclusion reached that exigent circumstances exist that if the officers go in there to do their lawful duty, they show up at the door and they funnel door and knock and say we're here to serve a search warrant. You've got someone who has repeatedly stated, I am going to use violence if you come back. And a reasonable suspicion that he has a firearm. Under that circumstance, a very clear case law in the Sixth Circuit, is that's an exigent circumstance. The exigent circumstance that Judge Anderson found, he was not clearly erroneous in finding that circumstance. In the Watson case, also authored by Judge Batchelder, that same exact approach is being used where what we are looking for is a reasonable suspicion that you've got a threat of harm to an officer and access to the means. Am I out of time? And that's what we add here, that's what justified the use of tact. It was unfortunate, it's not pretty, but it didn't need to happen, but it did and it was the decedent who prompted it. Thank you. Good morning, Your Honors. I am Betsy McKinney and I represent the officer in his individual capacity, Officer Penny. I will disagree a little bit in that this is not an issue of qualified immunity because I do feel like the District Court appropriately reviewed the first step of qualified immunity when he found that no constitutional violation had occurred. And so we did get that initial view from the District Court just simply once he found that there had not been a constitutional violation. He did not get to the second point of qualified immunity about whether or not it was clearly established. Officer Penny was a team member and a team leader of the tact squad. No, he did not make the risk assessment to utilize the tact squad. That is above his pay grade. Supervisors within the Memphis Police Department make that determination based on the risk that they assess. Once they determine that the tact squad is going in, Officer Penny has very little discretion in which the tact squad does enter a building. They're always going to use dynamic entry. That has been their practice since 1998, long before he was hired by the tact squad. Dynamic entry is going to use a no-knock and the flashbangs. Those are just standard operating procedures. Let me ask you a question about the end of this encounter. Let's say this case was at trial. As Judge Batchelder points out, we know that Mr. Moore was on the phone at the time or right around the time he was shot. Penny throws the flashbang in and goes in. A couple of seconds later, he shoots Mr. Moore. Would a jury be entitled to find... Let me step back. Some officers testified. Officer Penny, maybe one or two others. Officer Underwood as well. Officer Penny wasn't the officer that threw the flashbang in. There's a lot of smoke in the room. He's got a phone in his hand. We have, let's say, a couple of officers who testify at trial that Mr. Moore was holding the gun and pointing it at Officer Penny. Would a jury be entitled not to believe that testimony? I don't believe we would get to a jury because I don't believe the plaintiffs met their burden of showing evidence. There's plenty of documentary evidence showing that he did, in fact, point a gun. Wait a minute, wait a minute. Let's just assume we're at trial. Your proofs that Moore was pointing a gun are the testimony of two or three officers, correct? Correct, and there's some documentary evidence as well. Okay, and all that goes in. Is the jury entitled to conclude in its fact-finding role that no, I don't believe these officers, whether it's based on their credibility or based on smoke in the room or whatever and the phone in the hand, to conclude that I do not believe these officers? And so as fact-finders, we're going to decide the issue in this case as if he is not, in fact, holding the gun pointed at Officer Penny. I think you have to look and see what evidence there is showing that he was not. Why wouldn't a jury be able to simply, for the reasons I said, I think this person is not credible. The way they look, they evaluate credibility. They're allowed to decide they think someone is not telling the truth, plus the circumstances of smoke, confusion in the room. Flashbangs make it hard for everyone. I guess my question more specifically, why couldn't they reject that testimony and make a finding themselves that they don't think he was holding a gun? Because the district court in this case found there was undisputed fact that he was pointing and that all the other... That's what we're here to review. Right. Why couldn't the jury make the finding that I'm suggesting? There's no evidence that he was not because it was all speculation. For example, one thing that they like to say was that there was a gun still in a holster. The fact is there were two guns recovered from that room, one in a holster, one on his person, and that is documented throughout docket entry number 135 with evidence records, photographs. Without speculation, you can't find the existence of a fact based on speculation, but here it would be the nonexistence. You can't speculate that either Officer Penny nor Mr. Moore couldn't see. You can't speculate that because Officer Penny said he could see, and he aimed, and he was within three feet of Mr. Moore, and Mr. Moore pointed a gun, and that was supported by Officer Underwood who took possession of the gun, and the gun was found to be loaded. Is the plaintiff's counsel challenging that aspect of the district court's decision? I think he is. He's saying that the jury could decide that the weapon was not pointed? Yes, I think he is. And what's his evidence for that, the smoke? Well, he said that the gun was in the holster, but he ignores the fact that there's a second gun, completely ignored it. So the argument is the gun's in the holster? Yeah. Are there other arguments about it not being the truth that the officers saw him point the gun before? His other argument is Mr. Moore didn't get to testify. Mr. Moore's side of the story wasn't told. I submit Mr. Moore's side of the story was told because there was a rifle by every door, there was an ax by every door. I mean, he specifically set him in a corner to ambush these officers. When he was told that there was a search warrant, his response was, search warrant ain't no big shit. He knew exactly why those officers were there, and he chose to ignore it. I mean, he set his story in motion, and it's a heartbreaking story. Don't get me wrong. I feel terrible for his family, and Officer Penny feels terrible. He says that he sees Mr. Moore's face every single day, and if he could do it over again, unfortunately, he said he'd have to do the same thing again because the gun was pointing in his face. He said that he gave him an opportunity to comply. He said, Don, Don. He tried to set him at ease. It's the police. We have a search warrant. Don, Don. Search warrant ain't no big shit. That was Mr. Moore's testimony. He didn't care. Any other questions? Okay. Thank you, Your Honors. Thank you, Counsel. Several things, Your Honor. First of all, it's not a standard review where you have to find that the trial court was clearly erroneous. It's a de novo review. So you can find that you've – This question Judge Kethledge is asking, what do we do with this? I mean, so according to your counsel on the other side, one argument was the holster argument that she gave her response. What other arguments are you making in terms of it not being an established fact that he pointed the gun at the officer before they shot? Several things. One, Underwood never saw anybody point a gun at anybody. Underwood's testimony is that I saw another gun there. They chose not to take photographs of that other gun. I have not seen a photograph of the actual gun. There is a photograph of a gun in the holster. Circumstantial evidence, why? If you don't believe the police officers, if you're trying to cover for another police officer, could you see that? There is medical examiner proof that is the entry of the bullet. Was he doing this? It's going to be Penny's testimony that he was pointing a gun at me when smoke's going off. And I would submit to you – And so I think there is circumstantial evidence where a jury could say, I don't believe this guy. And one of the things that may or may not come into evidence before the trial court is that this isn't the first man that Officer Penny has killed on duty. Officer Penny has a history. Is this in the record? Yes. Certainly this is in the record. In 2003 or so, Officer Penny killed another man, got fired from his job, filed a civil service appeal. The second point you made was the entry of the bullet. Is that what you said? Entry of the bullet from the medical examiner. Explain to me how that contradicted the idea that the decedent pointed the weapon. What do you mean by that? It's interesting. It doesn't necessarily contradict the pointing, but it contradicts the story that Penny tells in terms of the angle that he's at. And if you change and you defeat his story of what angle the man was standing at through the entry and exit of the wounds, then you defeat his story and I think you attack his credibility. And then you start asking questions. Why didn't you take a picture of the gun sitting by his body? Why didn't you take a picture of the gun, period? Things like that. And if they question his credibility, and a big thing to me is, and again, I can't be a fortune teller and I wasn't in the room, so I can't tell your honors, absolutely he wasn't pointing the gun. I think there is a question of fact as to whether he was pointing the gun. It's one of these things that just is kind of tricky about these cases. I mean, let's say that Mr. Moore survives. Let's say it goes into his shoulder and now he's suing for damages because he can't use his shoulder. And he testifies that, yes, I had two firearms. One was on the night table three feet away and the other was in my holster. And Officer Penny says, no, it wasn't on the night table. It was in his hand pointing at me. I mean, I think that case would go to trial in terms of, there would be an issue of fact about whether it's on the night table or he's pointing it. But instead, he got shot through the neck and he died. And so now it's, as a matter of law, you know, so to speak, it's not on the night table. It is in his hand. I'm just trying to understand that. I gather you would say there is still an issue of fact even though we don't have testimony. I would say that. What about the absence of sort of proof, so to speak, that it was different than the officer said? Right. So Penny's story just doesn't add up when you look at the medical examiner's report and to entry of the bullets and what he says. It doesn't add up. But really what I'd ask is let's do a what if. Let's do the what if if Moore comes out instead of says I don't believe you that you're an officer. And in that moment when Penny's got his M4 yelling at him, I'm the police. I've got a search warrant. He doesn't start off by saying search warrant isn't anything. He starts off by saying you're not the police. You don't have no search warrant, that. And then later he says something that that's B.S. And it's subject to interpretation whether it's big, that ain't no big, or that's B.S. or whatever. But he doesn't believe these guys are cops. And he doesn't believe these guys really are who they say they are doing what they say they're doing. That's Penny's testimony. That was his inference from being there. And so Penny decides at that point I'm going to come in. But the statement the warrant doesn't mean whatever, that's not consistent with that. That's saying I don't care about warrants from anybody. That's not saying you're not cops. Your Honor, I absolutely agree. But after four flashbangs have been thrown in your room, that's when you're given the opportunity to comply for the very first time? And I think that is completely unconstitutional. For that to be the first opportunity for me to comply. It takes you back to the dangerousness or not of the person. I mean obviously there are certain people for whom you clearly would do what they did. And this one is closer. That's all. Sure. I understand that. But I want to play the what if game real quick in my last 33 seconds. What if he comes out and he says okay and he complies at that last minute? Are we saying that there wasn't a violation of his Constitution that they came in at night? When Wilson v. Arkansas says that a home is the safest place and there can't be a more egregious invasion than a nighttime invasion with flashbangs? And so that's the Supreme Court. And what if he says okay, you scared me to death. I ran into my room. I was fearful of my life. You busted my windows. You came in with grenades all in my house but I complied. And we were here on a civil rights case. I think we would win. And to give the city a pass because a scared man may or may not have been pointing a gun and if it was here or here, wherever it was, when he was lawfully entitled to protect himself if he didn't believe these people were police officers. And all the dispatcher had to say was Mr. Moore, they're cops. Comply. Thank you, Counsel. Thank you, Your Honor. You're all right that it is an ugly case. And it will be submitted. And there being nothing further this morning, the clerk may adjourn.